UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DEBORAH M. RACE,<br><br> Plaintiff,<br><br>v.<br><br>CAMBRIDGE HEALTH ALLIANCE,<br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)   No. 1:23-cv-10143-JEK<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**KOBICK, J.**

Plaintiff Deborah Race worked in the Information Technology ("IT") department of defendant Cambridge Health Alliance ("CHA") until November 2021, when CHA terminated her employment after she refused, on religious grounds, to be vaccinated against COVID-19 in accordance with CHA's vaccination mandate. Race subsequently initiated this action, alleging that she was wrongfully terminated on the basis of her religion, in violation of Title VII, 42 U.S.C. § 2000e-2(a), and Chapter 151B of the Massachusetts General Laws, and that CHA's vaccine mandate had a disparate impact on Evangelical Christians, also in violation of Title VII. Pending before the Court is CHA's motion for summary judgment. That motion will largely be denied because genuine disputes of material fact exist concerning whether Race refused to be vaccinated based on her sincerely held religious beliefs, and whether CHA could have accommodated Race without incurring substantial increased costs by permitting her to continue working remotely full time. Race has not, however, produced evidence that the vaccine mandate disparately impacted

Evangelical Christians, and she will accordingly be limited at trial to pursuing her Title VII claim on a theory of intentional religious discrimination.

## BACKGROUND

The following facts are either undisputed or recounted in the light most favorable to Race, the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

CHA is a community healthcare system that operates in several cities north of Boston. Race was hired by CHA in 1996 as a registered nurse. ECF 43, ¶ 1. She worked in that capacity until 2002, when she transferred to CHA's IT department to assist with its transition from paper to electronic medical records. *See id.*; ECF 45-1, at 19:22-20:22. Soon after assuming her new role, Race moved to Idaho, where she worked remotely for several years before resigning from CHA. *See* ECF 43, ¶ 1; ECF 45-1, 20:20-22:12.

Race subsequently moved back to Massachusetts, and, in February 2016, CHA rehired her to work as an informatics development analyst in its IT department. *See* ECF 43, ¶ 2; ECF 1, ¶ 2. In that role, Race was responsible for configuring software used by CHA's ambulatory and inpatient units. *See* ECF 43, ¶ 3. The informatics team observed a hybrid in-person/remote work arrangement, and team members were initially required to work in person two days per week. *See id.* ¶ 6. As time went on, however, the informatics team was required to come in only on Tuesdays, and Race testified that even this requirement eventually "went to the wayside." ECF 45-1, 26:2-25.

Race was promoted to Informatics Team Lead within CHA's IT department in 2018. ECF 43, ¶ 7. She reported to Brian Herrick, CHA's Chief Information Officer, until 2020, when she began reporting to Mark Sagon, CHA's Director of Informatics. *Id.* Race assumed managerial

2

responsibilities in her new role, overseeing software-related projects and medical device support that CHA's IT analysts provided to departments across several CHA hospital locations. *See id.* ¶ 8. In addition to her managerial responsibilities, Race continued to provide direct support to CHA's OB/GYN department by troubleshooting issues that arose with medical devices in clinical settings. *See id.* ¶ 9. Race testified that she and her team could perform these duties "100% remotely," primarily because they could remotely access the computers and medical devices at issue. ECF 45-1, at 33:22-35:8. On the rare occasions when in-person work was required, Race could delegate that work to members of her team or to members of another department at CHA. *See* ECF 43, ¶ 9; ECF 45-1, at 33:18-36:11, 37:24-38:21. Nevertheless, informatics team members, including Race, were expected to provide in-person support as needed. *See* ECF 43, ¶ 10; ECF 45-3, at 14:11-24.

The informatics team began working remotely full time in 2020 after the onset of the COVID-19 pandemic. *See* ECF 43, ¶ 13. Both before and after this switch, the informatics team maintained an "on-call" rotation schedule to ensure that one of its members would be available to provide ad hoc support and troubleshooting during off-hours, and to appear in person if needed. *See id.*; ECF 45-1, at 37:5-38:21. Informatics team members, including Race, were on call for one out of every eight weeks. *See* ECF 43, ¶¶ 11, 13. On-call employees could typically provide support remotely, and Race testified that "it was extremely rare" that an on-call employee would be required to provide in-person support. ECF 45-1, at 37:24-38:21. Sagon, Race's supervisor, recalled several occasions in 2020 and 2021 when informatics team members needed to provide on-site support, but he could not recall if Race was ever required to do so during that period. *See* ECF 45-3, at 15:1-22. Sagon felt that Race consistently performed high-quality work when working remotely. *See id.* at 15:23-16:6.

Soon after COVID-19 vaccines became available, CHA's senior leadership team decided to mandate that all CHA employees receive a COVID-19 vaccine. *See* ECF 43, ¶ 16. CHA reached this decision after concluding, based on extant data and expert opinions, that the vaccine was the best method to protect people—including CHA's patients and staff, as well as the broader community—from dying from COVID-19. *See id.* ¶¶ 17-18, 47; ECF 45-4, at 31:4-16.[1] On August 16, 2021, CHA's Chief Executive Officer, Dr. Asaad J. Sayah, sent an email to all CHA employees informing them of the vaccine mandate and stating that they would be required to receive a vaccine by October 18, 2021. *See* ECF 43, ¶ 19; ECF 36-4 (vaccine mandate email). The email also informed employees that they would be permitted to seek a religious or medical exemption from the vaccine mandate, and that religious exemption requests would be reviewed by an interdisciplinary panel. *See* ECF 36-4, at 3. Interdisciplinary panels were composed of individuals from CHA's occupational health, infectious diseases, legal, human resources, and leave-of-absence offices. *See* ECF 45-4, at 37:16-20. The panels collectively reviewed requests for religious exemptions, considering whether the totality of the circumstances supported a finding that an employee's exemption request was based on a sincerely held religious belief and whether granting an accommodation would pose an undue burden on CHA. *See* ECF 43, ¶ 23.

---

[1] Race argues that CHA has failed to produce evidence that its vaccine mandate was likely to reduce the spread of COVID-19. *See* ECF 44, at 13. That argument lacks merit. The First Circuit has recognized the scientific consensus that vaccinating against COVID-19 reduces the spread of the virus and the risk of serious illness following infection. *See Does 1-6 v. Mills*, 16 F.4th 20, 32-33 (1st Cir. 2021); *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 92-93 & n.3 (1st Cir. 2025) (taking judicial notice that in the summer of 2021, the Centers for Disease Control and Prevention advised that fully vaccinated people "are less likely to have asymptomatic infection or transmit [COVID-19] to others," and holding that an employer reasonably relied on guidance from public health authorities when concluding that "the vaccine reduces the likelihood of transmitting the virus" (quotation marks and citation omitted)).

Race timely requested a religious exemption from the vaccine mandate. *See id.* ¶ 25. She submitted the following materials in support of her request: a completed copy of CHA's Religious Exemption Application Form, ECF 45-7; a statement of the religious basis for her exemption request, certified by a reverend from Star Valley Apostolic Church, ECF 45-8; and a personal statement explaining in further detail the basis for her request, ECF 45-9. In her certified statement, Race stated that she is opposed to abortion based on her religious beliefs, that fetal cell lines linked to abortions were used in the development of the COVID-19 vaccines, and that receiving a COVID-19 vaccine would consequently "pos[e] a direct threat to [her] religious and moral obligations and adherence as an Evangelical Christian." ECF 45-8, at 1.

Race further elaborated on the basis for her religious objection in her personal statement. *See* ECF 45-9. She explained that although she was raised Catholic, she had converted to the Pentecostal church and was "born again" over a decade prior while living in the western United States. *See id.* at 2; ECF 45-7, at 3.[2] Race averred that she, "like all Pentecostals," believes that her "body is a temple of the Holy Spirit" and that it is her "responsibility and requirement to protect the physical integrity of [her] body against anything that would defile the temple of God." ECF 45-9, at 3. Citing her pro-life beliefs and the use of fetal cell lines in the development of COVID-19 vaccines, Race stated: "I do not support abortions at all, no matter how remote in time the abortion occurred, and therefore, it would be a violation of my sincerely held beliefs" to receive the COVID-19 vaccine. *Id.* at 4. Race also noted that she had worked remotely for the previous 18 months, and she requested "a 'reasonable' accommodation that does not constitute an undue hardship on [her] or CHA." *Id.*

---

[2] Race refers to herself interchangeably as a Pentecostal and an Evangelical Christian. *See, e.g.*, ECF 45-9, at 4.

On September 20, 2021, Race met with a four-member interdisciplinary panel—which included Vennesa Graure, CHA's Senior Director of Labor and Employee Relations, and John Burns, CHA's Leave of Absence Administrator, *see* ECF 34, at 4—to discuss her religious exemption request. ECF 43, ¶ 27. The panel began by asking Race to summarize her religious beliefs, but Race asserted that this was unreasonable because she had already explained those beliefs in her personal statement. *See* ECF 36-3, at 34; ECF 45-2, at 80:5-9; ECF 45-1, at 67:16-68:9. Race then asked the members of the panel whether they had read her statement; Burns said he had not, but Graure said she had. *See* ECF 45-1, at 67:16-23.[3] Although Race repeatedly stated that she was willing to answer specific questions that the panel had about her religious beliefs, they declined to ask any. *See* ECF 43, ¶ 30; ECF 45-1, at 67:16-68:9. Having reached a conversational impasse regarding her religious beliefs, Race began to voice secular concerns regarding the COVID-19 vaccine. *See* ECF 45-1, at 68:12-20. She asserted that the COVID-19 vaccine would have a disproportionate impact on the Black and Brown community and would not stop the spread of the virus. *See* ECF 43, ¶ 32; ECF 36-3, at 34; ECF 45-1, at 68:12-69:2. Race also asserted that receiving a third dose of the COVID-19 vaccine increased an individual's risk of hospitalization and death. *See* ECF 43, ¶ 32; ECF 36-3, at 34; ECF 45-1, at 88:16-20. Towards the end of the meeting, Race asked to discuss potential accommodations, but the panel declined to do so. *See* ECF 45-1, at 69:3-9. The meeting lasted roughly 15 minutes. *See* ECF 45-2, at 76:16-18.

---

[3] At his deposition, Burns testified that he read Race's personal statement at some point in time, but he did not indicate when he did so. *See* ECF 45-2, at 41:12-13. He also denied that any member of the panel stated during the meeting that they had not read the materials Race submitted. *See id.* at 84:4-9. Because there is a genuine dispute over whether Burns told Race during the panel meeting that he had not read her personal statement, this fact is recounted in the light most favorable to Race. *See Dixon-Tribou*, 86 F.4th at 458.

After this meeting, the panel concluded that Race's request for a religious accommodation "was based largely on secular reasons" and that permitting Race to work in person while unvaccinated would pose an undue hardship on CHA. *See* ECF 43, ¶¶ 41-42; ECF 45-4, at 53:1-9, 54:8-11. There is no evidence that the panel considered whether CHA could permit Race to continue working remotely full time as an accommodation, nor is there evidence that the panel considered the potential costs or hardship that CHA might have incurred if it granted such an accommodation. *See* ECF 45-4 at 53:1-54:11; ECF 45-1, at 69:3-9.[4]

On September 21, 2021, Burns emailed Race a letter stating that her request for a religious exemption had been denied. *See* ECF 43, ¶ 44; ECF 36-5, at 14; ECF 45-11, at 1. The letter informed Race that if she failed to receive the COVID-19 vaccine by October 18, 2021, she would be placed on administrative leave, and that if she remained unvaccinated by November 5, 2021, her position would be terminated. *See* ECF 36-5, at 14. Later that afternoon, Race responded to Burns' email to request an explanation for the denial. *See* ECF 45-11, at 1. Burns did not provide the requested explanation, and Race sent several follow-up emails over the course of the following month, eventually copying additional CHA personnel, including every member of the interdisciplinary panel. *See generally id.* In an email sent on October 3, 2021, Race wrote: "As you know, my requested accommodation was that you continue to allow me to work from home as I have been doing for the past 18 months. Even before the pandemic, IT was allowed to work

---

[4] When Graure was asked at her deposition whether CHA would have incurred any costs if it had permitted Race to continue working remotely, she responded: "Potentially. If she were needed on site in her role, there's a cost to not having the required staff that we need." ECF 45-4, at 48:2-7. She also testified that Herrick informed her that it was "possible" that Race would be required to work on site in the future if there were a task that required her specific skillset. *See id.* 45:18-47:17. There is no evidence, however, that Graure relayed this information to the panel, that the panel discussed the possibility of accommodating Race by permitting her to continue working remotely full time, or that the panel discussed the potential costs associated with such an accommodation. *See id.* at 53:1-54:11.

7

remotely." *Id.* at 3. And in an email sent on October 12, 2021, Race wrote: "By continuing to work remotely, I would not interact with staff or patients. This simple accommodation would not pose an undue hardship to CHA. I'm confused as to why you can not allow me to continue to work remotely without requiring me to be vaccinated." *Id.* at 5. Nobody at CHA directly responded to these questions.

On November 3, 2021, Graure emailed Race a letter indicating the reasons for the denial of her religious exemption request. *See* ECF 45-14. The letter listed five possible reasons for the denial, the following three of which were checked: (1) "The information you provided did not adequately explain why your religious belief prevents you from receiving the COVID-19 vaccine"; (2) "The information you provided indicates that the reason for your request is not based on a sincerely-held religious belief"; and (3) "Other (specify): You will be required to return onsite which would cause an undue hardship to the department." *Id.*[5] Race did not receive a COVID-19 vaccine, and her employment was terminated on November 5, 2021. ECF 43, ¶ 45.

CHA received a total of 52 requests for religious exemptions from its vaccine mandate. *See id.* ¶ 46; ECF 45-4, at 22:2-4.[6] It temporarily granted three of these requests for employees who were working remotely full time, but only so long as those employees did not need to work on site. *See* ECF 43, ¶ 49; ECF 45-4, at 22:5-18. One individual's temporary exemption expired when they were required to work on site, but the record does not indicate whether the other two individuals' exemptions ever expired. *See* ECF 45-4, at 22:22-23:14.

---

[5] One of the other reasons now at issue—namely, "[t]he requested accommodation is an undue hardship to the department"—was not checked. *See* ECF 45-14.

[6] Citing Graure's deposition testimony, CHA asserts in its statement of material facts that it received only 48 religious exemption requests. *See* ECF 43, ¶ 46. As Race points out, however, Graure testified that CHA received 52 religious exemption requests. *See id.*; ECF 45-4, at 22:2-4.

Race filed this action in January 2023. The complaint asserts claims for religious discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and M.G.L. c. 151B, § 4, as well as a claim alleging disparate impact on the basis of religion in violation of Title VII. ECF 1, ¶¶ 34-58. During discovery, CHA filed a motion for a protective order shielding its Chief Executive Officer from sitting for a deposition, ECF 16, and Race filed a motion to compel CHA to produce records and information concerning the other religious exemption requests that CHA received, ECF 18. In May 2024, the Court granted CHA's motion, and it granted in part and denied in part Race's motion. ECF 30. After the close of discovery, CHA filed a motion for summary judgment, ECF 33, which Race opposed, ECF 44. The Court took CHA's motion under advisement following a hearing. ECF 53.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting

9

*Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

### I. Religious Discrimination Claims.

Race asserts that CHA's failure to accommodate her sincerely held religious beliefs, and its subsequent termination of her employment, amounted to religious discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a), and M.G.L. c. 151B, § 4(1A). Both statutes prohibit employers from discriminating on the basis of religion. *See* 42 U.S.C. § 2000e-2(a); M.G.L. c. 151B, § 4(1A). To make out a claim of religious discrimination under the statutes,[7] Race "must first show 'that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action.'" *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024) (quoting *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023)). If Race makes that showing, the burden shifts to CHA "to show that it 'offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship.'" *Id.* (quoting *Lowe*, 68 F.4th at 719); *see also id.* at 17 (noting that undue hardship is an affirmative defense).

CHA contends that it is entitled to summary judgment because Race's opposition to the vaccine was not based on a sincerely held religious belief, and, in any case, because exempting her from its vaccination requirement would have amounted to an undue hardship. ECF 34, at 8-12. As

---

[7] Religious discrimination claims under Title VII and Chapter 151B are generally analyzed under the same framework. *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 131-32 (1st Cir. 2004); *Brown v. F.L. Roberts & Co.*, 452 Mass. 674, 676-77 (2008). With one exception, *see infra* note 9, Race points to no difference between the statutes that affects the analysis in this case, so the Court analyzes both claims under the Title VII framework.

10

to CHA's first argument, the First Circuit has cautioned that credibility determinations regarding the sincerity of an employee's religious beliefs are "quintessential fact questions" that "ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'" *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) (quoting *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999)). That is because "[d]etermining whether a belief is religious is 'a difficult and delicate task.'" *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 90 (1st Cir. 2025) (quoting *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 132 (1st Cir. 2004)). "The law does not require that a religious practice or belief at issue be 'acceptable, logical, consistent, or comprehensible to others.'" *Bazinet*, 113 F.4th at 16 (quoting *Unión Independiente*, 279 F.3d at 56). Further, the "fact that there is 'overlap between a religious and political view does not necessarily place the view outside the scope of Title VII's religious protections.'" *Id.* (brackets omitted) (quoting *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901 (8th Cir. 2024)).

     CHA does not dispute that Race is an Evangelical Christian, but it argues that her opposition to the COVID-19 vaccine was not based on a sincerely held religious belief. ECF 34, at 9. Citing the secular concerns Race raised during her meeting with the interdisciplinary panel, CHA contends that her "actual reasons for avoiding the vaccine were based on fringe health-related concerns that were not remotely grounded in her religion." *Id.* (emphasis omitted). Race admits that she raised secular concerns about the efficacy and risks of the COVID-19 vaccine during the panel meeting. *See* ECF 43, ¶¶ 32-34. But when asked about the basis for her objection to the vaccine at her deposition, Race responded: "It has nothing to do with the efficacy. It has to do with my religious beliefs." ECF 45-1, at 64:16-21. And in the religious exemption request she submitted, Race averred that she is firmly opposed to abortion in accordance with her religious

11

beliefs as an Evangelical Christian, and that she was therefore opposed to receiving the COVID-19 vaccine because fetal cell lines were used in its development. *See* ECF 45-7, at 4; ECF 45-9.

The record thus contains evidence that would permit a rational factfinder to conclude that Race opposed the vaccine based on sincerely held religious beliefs, secular concerns, or both. On the one hand, if a jury were to fully credit Race's testimony, it could conclude that Race opposed receiving the COVID-19 vaccine based on her religious opposition to abortion, notwithstanding the fact that she also opposed the vaccine on secular grounds. On the other hand, if the jury declined to fully credit Race's testimony, it could conclude that Race cited her religious beliefs as pretext for her secular concerns about the vaccine's efficacy and risks. The Court accordingly concludes that a genuine factual dispute exists concerning the sincerity of Race's asserted religious opposition to the COVID-19 vaccine. *Cf. Bazinet*, 113 F.4th at 17. This dispute must be resolved by the factfinder at trial. *See Unión Independiente*, 279 F.3d at 56.

CHA next contends that even if Race can make out a prima facie claim for religious discrimination, it is nevertheless entitled to summary judgment because granting Race an accommodation would have imposed an undue hardship on its business. "'The undue hardship defense is built into the statutory definition of 'religion,' *see* 42 U.S.C. § 2000e(j), such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense applies.'" *Bazinet*, 113 F.4th at 17-18 (quoting *Lowe*, 68 F.4th at 724).[8] To prevail on an undue

---

[8] Race argues that CHA waived its undue hardship defense by failing to affirmatively raise the defense in its answer, ECF 7, as required by Federal Rule of Civil Procedure 8(c). *See* ECF 44, at 9-10. The First Circuit has warned that "affirmative defenses not included in an appropriate responsive pleading are waived." *Carrasquillo-Serrano v. Mun. of Canovanas*, 991 F.3d 32, 42 (1st Cir. 2021). But it has also affirmed district courts' discretion to "excuse a failure to plead 'if a plaintiff receives notice of an affirmative defense by some means other than pleadings and is not prejudiced by the omission of the defense from the initial pleading.'" *Lawless v. Town of Freetown*,

hardship defense, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023); *see Rodrique*, 126 F.4th at 91. The undue hardship standard is fact and context specific; it "requires courts to take 'into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer.'" *Bazinet*, 113 F.4th at 18 (quoting *Groff*, 600 U.S. at 470-71).

CHA has failed to demonstrate that any reasonable jury would find that granting Race an accommodation would have amounted to an undue hardship. As a threshold matter, CHA inaccurately asserts that Race requested, as an accommodation, "to remain unvaccinated and work on-site." ECF 34, at 10. That assertion finds no support in the record. Race asked to be exempted from the vaccine mandate and continue working remotely full time, not to be exempted from the mandate and work on site. In the emails Race sent after learning that her exemption request had

---

63 F.4th 61, 65 (1st Cir. 2023) (quoting *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir. 1994)). A district court may excuse a failure to plead where the totality of the relevant circumstances support "a practical, commonsense conclusion that Rule 8(c)'s core purpose—to act as a safeguard against surprise and unfair prejudice—has been vindicated." *Id.* at 65-66 (quotation marks and citation omitted).

The Court will excuse CHA's failure to plead its undue hardship defense because, in the circumstances of this litigation, Rule 8(c)'s "core purpose" has been vindicated. *See id.* Race has been on notice that CHA might raise an undue hardship defense since before this litigation commenced. In her personal statement, Race requested "a 'reasonable' accommodation that *does not constitute an undue hardship* on me or CHA." ECF 45-9, at 4 (emphasis added). And the November 3, 2021 letter that Graure emailed to Race explained that CHA had denied her exemption request in part because Race would "be required to return onsite which would cause an undue hardship to the department." ECF 45-14. In addition, Race has not been prejudiced by CHA's failure to plead. Race's counsel conducted discovery with a clear awareness that CHA was likely to raise this defense. *See, e.g.*, ECF 36-5, at 30-31 (interrogatories that Race submitted asking whether CHA concluded that granting Race's exemption request "would have imposed a burden on CHA," and, if so, inquiring into the analysis that CHA performed to reach this conclusion); ECF 45-4, at 48:2-24, 53:1-54:11 (Race's counsel asking Graure a series of questions concerning undue hardship).

been denied, she repeatedly asked why CHA would not grant her this accommodation. *See* ECF 45-11, at 4 ("As you know, my requested accommodation was that you continue to allow me to work from home as I have been doing for the past 18 months."); *id.* ("I'm confused as to why you can not allow me to continue to work remotely without requiring me to be vaccinated."); *see also* ECF 45-9, at 4 (Race writing at the conclusion of her personal statement: "I have worked remotely for the last 18+ months and request that you provide me a 'reasonable' accommodation that does not constitute an undue hardship on me or CHA."). No one at CHA directly responded to these questions. Race also testified that she attempted to discuss potential accommodations during her meeting with the interdisciplinary panel, but that she was told, "no, that's not what we're here to talk about," when she brought up the topic. ECF 45-1, at 69:3-9.

There is no evidence that CHA ever considered whether permitting Race, an informaticist in CHA's IT department, to continue working remotely full time would have resulted in "substantial increased costs in relation to" its business of providing healthcare. *Groff*, 600 U.S. at 470. Several CHA employees testified that *if* Race were needed on site but unable to come, her absence would impose a burden or increased costs on CHA. *See* ECF 36-3, at 48:5-7, 51:13-17; ECF 45-3, at 31:24-32:4. But there is no evidence that anyone at CHA determined that Race would in fact be needed on site, or even that she would likely be needed. *See, e.g.*, ECF 45-4, at 46:21-24 (Graure testifying that Herrick informed her that Race "*may* need to come in and report on site if there was something that required her specific knowledge base" (emphasis added)); *see also* ECF 45-3, at 26:7-13 (Sagon testifying that he had not been asked whether Race would be needed on site). Nor is there evidence that Race had actually worked on site in the 18 months before her exemption request. On this record, CHA did no more than speculate as to any costs that it might have incurred had it granted Race's requested accommodation.

14

Even assuming that Race's skillset would have been needed on site, CHA has nevertheless failed to establish that the costs of exempting Race from on-site work—for example, by delegating her on-site duties to other members of her team—would have been "substantial in the overall context of [its] business." *Groff*, 600 U.S. at 468.[9] Race testified that in the rare instances when she had been called on site to troubleshoot or provide in-person support, she had been able to delegate those visits to other informatics team members. *See* ECF 45-1, at 38:14-21. Sagon confirmed that some informatics team members were willing to go on site in place of the designated on-call employee when the need arose. *See* ECF 45-3, at 53:13-22. He could not recall any instances in 2020 or 2021 when an informatics team member needed to provide on-site coverage for Race. *See id.* at 54:13-19.

A rational jury could therefore find that CHA could have accommodated Race's request to be exempted from its vaccine mandate without incurring substantial increased costs by permitting her to continue working remotely full time. A jury could also find that CHA could have granted

---

[9] At the hearing, CHA argued for the first time that an accommodation that would involve delegating one employee's duties to another employee is *per se* unreasonable under Massachusetts law. CHA did not cite any authority for this proposition, nor has the Court located any such authority through its own research. When considering whether an accommodation would pose an undue hardship under Chapter 151B, Massachusetts courts ask "'whether the employer could have exercised its managerial discretion in such a way that the employee's religious obligations could have been reasonably accommodated.'" *Brown*, 452 Mass. at 678 (quoting *N.Y. & Mass. Motor Serv., Inc. v. Mass. Comm'n Against Discrimination*, 401 Mass. 566, 576 (1988)). Chapter 151B states that an accommodation might pose an undue hardship if "the employee's presence is indispensable to the orderly transaction of business and his or her work cannot be performed by another employee of substantially similar qualifications." M.G.L. c. 151B, § 4(1A). The statute thus contemplates the possibility that an accommodation involving the delegation of one employee's duties to another employee might be reasonable under Massachusetts law if the employee's presence is not "indispensable" and their work can be performed "by another employee of substantially similar qualifications." *Cf. Groff*, 600 U.S. at 473 ("Faced with an accommodation request like Groff's, [i.e., to not work on Sundays,] it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary.").

15

Race a temporary exemption, as it did for three other employees, for as long as Race "did not need to return to any CHA location on site." ECF 45-4, at 22:16-18. Because there is a genuine factual dispute over whether CHA could have accommodated Race without suffering an undue hardship, CHA's motion for summary judgment on Race's religious discrimination claims under Title VII and Chapter 151B must be denied. *See Rodrique*, 126 F.4th at 90-91 ("[T]o succeed on summary judgment and avoid Title VII liability, [the employer] must show that there was no genuine dispute of material fact that granting [the plaintiff's] exemption request would have imposed an undue hardship on its business.").

## II. **Disparate Impact Claim.**

Race also claims that CHA is liable for violating Title VII because its vaccine mandate disparately impacted Evangelical Christians, like Race, who oppose the COVID-19 vaccine on religious grounds.[10] Title VII prohibits "'not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'" *E.E.O.C. v. Steamship Clerks Union, Loc. 1066*, 48 F.3d 594, 601 (1st Cir. 1995) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). "A plaintiff proceeding under a disparate impact theory 'establishes a prima facie violation by showing that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Abril-Rivera v. Johnson*, 806 F.3d 599, 606 (1st Cir. 2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)). Unlike in disparate

---

[10] Race argued for the first time at the hearing that CHA's vaccine mandate disparately impacted *all* employees who objected to the COVID-19 vaccine on religious grounds. This argument was waived, however, because Race failed to raise it in either her complaint or in her opposition to CHA's motion for summary judgment, which asserted only that the vaccine mandate disparately impacted Evangelical Christians. *See* ECF 44, at 12-13; *see, e.g.*, *LaVallee v. Town of Dedham*, 736 F. Supp. 3d 26, 53 & n.17 (D. Mass. 2024), *appeal dismissed*, No. 24-1644, 2024 WL 5347171 (1st Cir. Nov. 26, 2024); *cf. United States v. Pizarro-Berrios*, 448 F.3d 1, 5 (1st Cir. 2006) ("[E]xcept in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.").

treatment cases, where a plaintiff must adduce proof of intentional discrimination, the evidence in "disparate impact cases usually focuses on statistical disparities . . . and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988) (quotation marks omitted). The Supreme Court has "described a prima facie showing of disparate impact as 'essentially a threshold showing of a significant statistical disparity.'" *Jones v. City of Boston*, 752 F.3d 38, 46 (1st Cir. 2014) (quoting *Ricci*, 557 U.S. at 587). "If the plaintiff makes out a prima facie case, the employer 'may defend against liability by demonstrating that the practice is job related for the position in question and consistent with business necessity.'" *Abril-Rivera*, 806 F.3d at 606 (quoting *Ricci*, 557 U.S. at 578). "And if the employer makes that showing, the plaintiff may rebut it by demonstrating 'that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs.'" *Id.* (quoting *Ricci*, 557 U.S. at 578).

Race has adduced evidence that CHA received 52 requests for religious exemptions from its vaccine mandate, and although it granted three of these requests on a temporary basis, it did not grant any permanent exemptions. *See* ECF 43, ¶¶ 46, 49; ECF 45-4, at 22:2-23:4. She argues that CHA's failure to grant permanent exemptions constitutes proof that the mandate "disparately affected Evangelical Christians who could not take the vaccine for religious reasons." ECF 44, at 13. This argument misapprehends the showing required to make a prima facie case of disparate impact discrimination. The relevant inquiry is whether there exists a "'significant statistical disparity'" between the percentage of Evangelical Christian CHA employees who experienced an adverse employment action because of their refusal to comply with the vaccine mandate as compared to CHA's employees who are not Evangelical Christians. *See Jones*, 752 F.3d at 46 (quoting *Ricci*, 557 U.S. at 587). Race has produced no evidence of such a disparity. Nor has she

17

proffered evidence of how many Evangelical Christians work at CHA or how many Evangelical Christians applied for an exemption from the vaccine mandate on religious grounds.[11] Focusing, as Race does, only on the absolute number of religious exemption requests that CHA granted or denied does not reveal anything about whether the vaccine mandate disparately impacted Evangelical Christians. Race has thus failed to make out a prima facie claim that CHA's vaccine mandate disparately impacted Evangelical Christians. *Cf. Kennedy v. PEI-Genesis*, 719 F. Supp. 3d 412, 419 (E.D. Pa. 2024) (granting employer's summary judgment motion where plaintiff had not "offered anything that suggest[ed] that those who share his religious beliefs [were] underrepresented at [the employer's company], much less that their underrepresentation [was] the result of the company's Covid vaccination policy"), *aff'd*, No. 24-1563, 2025 WL 602159 (3d Cir. Feb. 25, 2025); *Muslim v. Sagamore Children's Psychiatric Ctr.*, No. 22-cv-07850-JMA, 2024 WL 3431959, at *8 (E.D.N.Y. July 15, 2024) (holding that a Muslim plaintiff failed to plead prima facie case of disparate impact because he asserted "in a purely conclusory manner" that the employer's vaccine mandate "serve[d] as a de facto barrier to Muslim Applicants being

---

[11] Race did not specifically seek such evidence through her motion to compel, ECF 19, which the Court granted in part and denied in part, ECF 30. While Race did ask the Court to compel CHA to produce each of the religious exemption requests it received—which presumably would have identified each applicant's religious beliefs or affiliation—she argued that these forms were relevant to her claims only because they would "show that CHA concocted a plan to *uniformly* deny these applications regardless of the strength of the applicants' convictions." ECF 19, at 10 (emphasis added). She did not argue that these forms were relevant to her claim that CHA's vaccine mandate disparately impacted Evangelical Christians who opposed taking the COVID-19 vaccine on religious grounds. *See generally id.* The Court accordingly declined to compel CHA to produce those exemption forms, because Race's "theory of discrimination," as articulated in the memorandum supporting her motion to compel, "challenge[d] CHA's process for considering religious exemption requests" writ large, not its process for considering the specific religious basis for each request. *See* ECF 30, at 9. The Court did, however, order CHA to produce documents identifying the reasons for its rejection of each religious exemption application. *See id.* at 9-10. There is no evidence that Race specifically sought evidence concerning the number of Evangelical Christians who worked at CHA or the number of Evangelical Christians who sought a religious exemption from CHA's vaccine mandate.

successfully hired," but did "not sufficiently plead that a disparity exist[ed] between Muslim applicants and non-Muslim applicants" (quotation marks omitted)).

## CONCLUSION AND ORDER

For the foregoing reasons, CHA's motion for summary judgment, ECF 33, is GRANTED in part and DENIED in part. Race's Title VII and Chapter 151B claims survive. At trial, however, Race may pursue her Title VII claim only on a theory of intentional religious discrimination, not on a disparate impact theory.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: July 23, 2025